**Larry A. RUFFALO, Plaintiff–Appellant,**

v.

**Joanne B. BARNHART, Commissioner of Social Security, Defendant–Appellee.**

No. 02–3953.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 2003.

Decided May 1, 2003.

Before COFFEY, RIPPLE, and
EVANS, Circuit Judges.

## ORDER

Larry Ruffalo applied for Social Security Disability Insurance Benefits in July 1996, claiming that disabling knee pain had prevented him from working since August 1994. An administrative law judge denied Ruffalo benefits, concluding that Ruffalo was not disabled because he could perform a significant number of jobs in Wisconsin's economy. After the Social Security Administration's Appeals Council denied review, Ruffalo filed this action in district court. A magistrate judge recommended remanding the case to the Social Security Administration for further consideration because the ALJ failed to discuss certain questionnaires filled out by a physician as well as the effects of medications on Ruffalo's ability to work. The district judge, however, disagreed with the recommendation and affirmed the ALJ's decision, finding that even though the ALJ should have addressed these matters, a remand to consider this evidence would not lead to a different result. We affirm.

Ruffalo, who is now 47 years old and has a twelfth-grade education, worked for the Chrysler Corporation until August 1994. When he started at Chrysler in 1973, he worked on the assembly line performing heavy, unskilled work, and in 1988 he became a parts stock handler. As a stock handler, he performed heavy, semi-skilled work. According to Ruffalo, that work required him to climb, squat, stand, walk, and lift 75 pounds.

On three occasions while on the job, Ruffalo suffered injuries to his right knee that led to operations. The first injury occurred in December 1992—he fractured the patella (knee cap) in his right knee. He returned to work in April 1993 after undergoing surgery and physical therapy. In January 1994 Ruffalo again injured his right knee, for which he underwent a second operation, and he returned to work in July 1994. Unlike his previous return to work, this time doctors limited him to "light duty with restrictions of no extended standing, kneeling, squatting or climbing." The following month, however, Ruffalo injured his right knee for the third time. He was operated on by Dr. Daniel Wilson, who permitted Ruffalo to begin working again in July 1995.

In August 1996 Ruffalo visited Dr. Wilson for a final orthopedic evaluation. According to Dr. Wilson's report, Ruffalo complained of knee pain and requested medication, but the examination revealed no swelling and only minimal tenderness. Wilson diagnosed osteochondritis of the right knee (bone inflammation) and prescribed Darvocet (a mild narcotic pain reliever) for the pain. He also advised Ruffalo to take over-the-counter pain medication, wear a knee brace, do knee-strengthening exercises, not lift over 25 pounds, and not stand for long periods of time. Noting that Ruffalo had been attending a vocational rehabilitation class but recently quit because of the pain, Wilson opined that Ruffalo showed no interest in complying with the recommended knee exercises, was "not motivated to return to any type of gainful employment and ha[d] been trying to live on the same type of disability benefits for years," and was "also over reliant on pain medications."

In December 1997 Ruffalo submitted to the Social Security Administration three questionnaires completed by his treating physician Dr. William Dale. In a questionnaire assessing Ruffalo's need to rest because of pain, Dr. Dale opined that Ruffalo

required "complete freedom to rest frequently without restriction." In another questionnaire assessing Ruffalo's pain and related symptoms, Dale concluded that some, but not all, of Ruffalo's complaints were consistent with the diagnosis and findings. Ruffalo complained that he experienced constant pain, had to elevate his leg for at least two hours per day (to reduce swelling and numbness), was still in pain despite taking pain medication, and experienced dizziness, grogginess, and concentration/attention problems as a result of the pain medication. But inconsistent with the diagnosis and findings, Dale noted, were Ruffalo's complaints of numbness in his leg.

In October 1999 Ruffalo visited Dr. P. Spottswood, a surgeon, for an evaluation of pain in his right upper extremity. Spottswood noted in a summary of the visit that Ruffalo complained of pain in his right knee so he prescribed Relafen (an anti-inflammatory). He also noted that Ruffalo complained of paraesthesias (abnormal sensation) and pain in his right upper extremity, which Spottswood believed was "chronic C7 radiculopathy" (a disorder of the spinal nerve roots). Spottswood gave Ruffalo a cervical epidural steroid and local anesthetic injection (apparently in the right upper extremity) and prescribed Vicodin.

In November 1999 Dr. Spottswood prepared a "Symptom Questionnaire—Upper Extremities" about Ruffalo for the Social Security Administration. In the questionnaire, he stated that Ruffalo suffered from moderate pain that occasionally interfered with his attention and concentration, but opined that Ruffalo's pain was not consistent with the objective medical findings. In conclusion, Dr. Spottswood noted that Ruffalo did experience numbness, tingling, and stiffness in his upper extremities and

that repetitive activity exacerbated these symptoms.

At his disability hearing before the ALJ in November 1999, Ruffalo described his symptoms, treatment routine, and daily activities. He testified that he experienced pain, numbness, and swelling in his right leg and pain in his neck that radiated into his arms. His knee pain limited him to about 5–10 minutes of walking or standing before his leg went numb–he could not bend, stoop, or squat. His neck pain interfered with his ability to grip objects and his ability to concentrate. To control the pain, he took Vicodin, Celebrex, and Torodol, elevated his leg approximately five hours a day, wore a TENS unit ("transcutaneous electrical nerve stimulation"—a treatment that uses electrical current to relieve pain) on his leg, and received injections in his neck. The medication, however, blurred his vision and made him "droggy [sic]." Ruffalo also testified that because of the pain, he remained in bed approximately 16–18 hours a day and could not perform any housework (he lived with his sister and her two children), but he could drive occasionally and attended church approximately every other week.

William Reynolds, Jr., a vocational expert, testified as to the number of jobs available to an individual of Ruffalo's background and physical condition. The ALJ posed a hypothetical to Reynolds that incorporated Ruffalo's vocational factors (age, education, and past work) and the restrictions that he not lift 25–pounds or stand for long periods of time. After clarifying that the ALJ was looking for "modified light" positions, Reynolds opined that there were 6,500 sorter positions, 11,000 packer positions, 16,875 light sales attendant positions, and 5,000 counter clerk positions available. These positions also allowed "for a full range of sedentary work."

Reynolds then answered questions—posed by Ruffalo-that introduced new restrictions. When asked if an individual could work if he "need[ed] complete freedom to rest and rest was defined ... as sit or lie in a fixed, supported position," Reynolds responded that at the semi-skilled and unskilled levels, substantial gainful activity would be precluded. Next asked how an individual's ability to work would be affected by a requirement that a leg be elevated for two hours, Reynolds again responded that work would be precluded. Finally, when asked about an individual with concentration problems, Reynolds stated that work would be precluded.

Applying the standard five-step analysis, the ALJ concluded that Ruffalo was not disabled under 42 U.S.C. §§ 416(a)(1), 423. At step one, the ALJ found that Ruffalo had not engaged in substantial gainful work since 1994. At steps two and three, the ALJ found that Ruffalo's knee injuries qualified as a "severe impairment" but that the impairment did not equal an impairment listed in 20 C.F.R. Subpart P, Appendix 1. At step four, the ALJ found that Ruffalo could not perform his past relevant work but had a residual functional capacity (RFC) "to perform a full range of sedentary work and a modified range of light work." The ALJ noted that there was "no medical evidence documenting [that] the claimant has any severe neck impairment" and that the restrictions imposed by Dr. Wilson (e.g., not lifting over 25 pounds and not standing for extended periods of time) were supported by the medical evidence. Further, the ALJ gave little weight to Ruffalo's testimony regarding limitations in carrying out his daily activities because "[d]espite [Ruffalo's] testimony that he spent 17–18 hours each day in bed, he was observed to be a tanned individual with good muscle tone. [He] appeared to be in good physical condition." Finally, at step five, the ALJ accepted the vocational expert's testimony and found that Ruffalo could perform a significant number of jobs in the economy.

Ruffalo sought review of the ALJ's decision in district court. He argued that the court should remand his case for reconsideration on seven grounds, including the ALJ's failure to consider Dr. Dale's medical assessments and the inadequacy of a hypothetical question posed by the ALJ to the vocational expert that failed to account for the side effects of Ruffalo's medication on his ability to work. Chief Judge Crabb referred the matter to a magistrate judge, who recommended reversing the Commissioner's decision and remanding the case so that the three questionnaires submitted by Dr. Dale and the side effects of Ruffalo's medication could receive consideration.

Judge Crabb rejected the magistrate judge's recommendation and entered judgment for the Commissioner. She acknowledged that the ALJ should have explained why he gave little weight to Dr. Dale's questionnaires, but she went on to say that "[s]ending the case back to defendant to 'cure' the omission is unnecessary when it is evident that consideration of this meritless evidence would not change defendant's decision." Further, noting that the ALJ's failure to address Ruffalo's use of strong medication would ordinarily be "significant error," Judge Crabb stated that remand was not appropriate because there was no evidence "that plaintiff was taking strong painkillers on a regular or longterm basis" and "the record would not support a finding that painkillers had any effect on [Ruffalo's] ability to work."

We will uphold an ALJ's decision denying disability benefits if the ALJ applied the proper legal standard and substantial evidence supported the decision. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002);

60

*see also* 42 U.S.C. § 405(g). Substantial evidence "requires no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir.2000) (internal quotation omitted). When we review an ALJ's decision, we must accept the ALJ's findings of facts and will not reweigh the evidence. *Id.* The ultimate issue on appeal is whether substantial evidence supports the ALJ's finding at step five that Ruffalo could perform sedentary or modified light work, and therefore, could perform a significant number of jobs in the economy. *See Steele*, 290 F.3d at 939–40 (detailing five-step analysis).

Ruffalo's principal contention on appeal is that the ALJ needed to consider the three questionnaires submitted by Dr. Dale in which he opined that Ruffalo has to elevate his leg and requires "complete freedom to rest." Ruffalo notes that, according to the vocational expert, these restrictions were inconsistent with the ALJ's finding that Ruffalo had an RFC to perform sedentary or modified light work. An ALJ need not address every piece of evidence in the administrative record, but he cannot ignore evidence contrary to his decision. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir.2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir.2001).

The Commissioner concedes that the ALJ failed to discuss Dr. Dale's questionnaires, but argues that we should not remand the case because the result would be the same if the ALJ addressed the questionnaires. *See, e.g., Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

■ Remand is not appropriate here because the ALJ was entitled to give little weight to Dr. Dale's medical assessment relative to the other evidence in the record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir.2000); *see also* 20 C.F.R. § 404.1527(d) (listing factors for evaluating medical opinions, including the treatment relationship and medical support for the doctor's opinion). First, Dr. Dale did not indicate on the questionnaires whether he based his opinions on an examination of Ruffalo or a review of Ruffalo's medical records. Second, Dr. Dale did not cite medical findings to support his assessment of Ruffalo's ability to work, even though he was specifically asked to do so on the questionnaire. Without any supporting objective evidence providing a foundation for Dr. Dale's opinions, the ALJ was entitled to credit Dr. Wilson's opinion (which was supported by a physical examination) and find Ruffalo capable of performing sedentary or modified light work.

■ Ruffalo next argues that the ALJ's hypothetical question to the vocational expert failed to incorporate any reference to the side effects of his medication. According to Ruffalo, the ALJ's hypothetical question should have referred to his grogginess and blurry vision caused by his medication. An ALJ's hypothetical questions to a vocational expert, however, need include only those nonexertional limitations supported by medical evidence. *See Steele*, 290 F.3d at 942. Here, no objective medical evidence substantiates Ruffalo's complaints that he experienced grogginess and blurry vision. Ruffalo testified as to these effects, but his testimony by itself is not medical evidence, 20 C.F.R. § 404.1512(b) (medical evidence includes laboratory findings, medical signs, or other evidence from medical sources); *see also Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (medical evidence also includes a

physician's observations). While it is true that Dr. Dale opined that Ruffalo's medication caused "dizziness, grogginess, and concentration/attention problems," the ALJ could properly discount this opinion because it was not supported by objective medical evidence. Thus, the ALJ properly excluded any reference to side effects from his hypothetical question.

AFFIRMED.